UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Bobcat of Duluth, Inc.,                                    Civ. No. 16-1007 (PAM/LIB)
a Minnesota corporation,

                          Plaintiff,

v.                                                          **MEMORANDUM AND ORDER**

Clark Equipment Company, a
Delaware corporation d/b/a
Bobcat Company,

                          Defendant.

---

This matter is before the Court on Defendant's Motion for Summary Judgment. For the following reasons, the Motion is granted.

**BACKGROUND**

Defendant Clark Equipment Co. d/b/a Bobcat Co. ("Bobcat") manufactures and sells compact equipment, which it distributes to consumers through a network of independently owned dealers. (Ross Aff. (Docket No. 27) at 2-3.)  Bobcat maintains one-year dealer agreements with its independent dealers, who sell Bobcat products directly to consumers.  (Id. at 3-4.)  Its dealer agreements include two provisions relevant to this lawsuit.  The first provision prohibits a dealer from assigning or transferring the dealer agreement without Bobcat's prior written consent.  (Id. (Docket No. 29) Ex. 1 ¶ 16.)  The second is a right-of-first-refusal provision, which gives Bobcat the right to buy a dealership first if the dealer receives an offer from another prospective buyer that it is willing to accept.  (Id. ¶ 21.)

Since 2000, Plaintiff Bobcat of Duluth, Inc. ("Bobcat of Duluth"), has been one of Bobcat's independent dealers and in that capacity has signed Bobcat's annual dealer agreements. (Holland Decl. (Docket No. 34-3) Ex. 3 at 3-4.) From 2000 to 2002, Bobcat of Duluth exclusively sold Bobcat equipment. (Id. at 4.) In 2002, a Bobcat representative recommended that Bobcat of Duluth also sell equipment manufactured by Kubota Tractor Corporation to supplement its Bobcat sales. (Id.) Kubota maintains product lines that compete with Bobcat. (Ross Aff. at 4.) Since 2002, Bobcat of Duluth has sold both Bobcat and Kubota equipment. (Id.)

In 2012, Bobcat implemented a policy of exclusivity by requiring its new dealers to sign a dealer agreement that prohibited the sale of products that compete with Bobcat's product lines. (Holland Decl. (Docket No. 34-1) Ex. 1 at 9-12.) This exclusivity policy was not reflected in Bobcat's annual dealer agreements with Bobcat of Duluth, and in 2013, Bobcat of Duluth added two Kubota products that compete with Bobcat's products. (Id. at 17-18; Ross Aff. at 4.) Bobcat of Duluth claims that it was not aware of this policy until it attempted to sell its dealership.

On December 5, 2014, the president of Bobcat of Duluth, Matthew Mahoney, notified Bobcat that he intended to sell his business. (Ross Aff. at 5.) Bobcat responded by stating that it would require any prospective buyer to sell only Bobcat product lines as a condition of its approval and consent. (Id. (Docket No. 28-1) Ex. 3.) Consequently, it suggested that Bobcat of Duluth should sell the Bobcat portion of its dealership separate from the Kubota portion. (Id.)

In November 2015, Bobcat of Duluth identified a prospective buyer, Quality Forklift Sales and Service, Inc., ("Quality Forklift"). Quality Forklift was interested in purchasing the dealership, but it wanted to buy both the Bobcat and the Kubota businesses. (Gleekel Aff. (Docket No. 26-1) Ex. B.) Bobcat of Duluth forwarded to Bobcat a copy of Quality Forklift's non-binding letter of intent ("LOI") to purchase the dealership for $2.3 million, as well as information about Quality Forklift, and requested Bobcat's consent to sell Bobcat of Duluth to Quality Forklift and transfer the dealer agreement. (Holland Decl. (Docket No. 34-4) Ex. 4.)

On December 7, 2015, after reviewing the business plan and conditionally approving the transfer, Bobcat sent a letter and new dealer application to Quality Forklift. (Ross Aff. (Docket No. 28-1) Ex. 5 at 2-3). The letter set out certain requirements to purchase the dealership and transfer the dealer agreement, including that Quality Forklift must (1) sign a new dealer agreement that contained exclusivity provisions, (2) not sell any competitive attachments with Bobcat equipment, (3) achieve specific market share commitments as specified in Quality Forklift's business plan, (4) have at least 50% Bobcat equipment in its rental fleet, and (5) agree that Bobcat may terminate the dealer agreement if Quality Forklift fails to cure any breach of these requirements within 60 days. (Id.) Three days later, Quality Forklift responded by modifying or omitting these conditions. (Holland Aff. (Docket No. 34-6) Ex. 6.) Quality Forklift would only agree to (1) sign a dealer agreement consistent with Bobcat of Duluth's existing dealer agreement, (2) "use its best efforts to increase market share commitments," (3) "have a rental fleet of Bobcat equipment," and (4) "resolve in good faith" any breaches in requirement "in a

timely manner." (Id.) Based on Quality Forklift's unwillingness to agree to its conditions, Bobcat withheld consent to approve the dealership transfer. (Ross Aff. Ex. 7.)

Mahoney then sought prospective buyers to purchase the Bobcat and Kubota businesses separately. Quality Forklift offered $525,000 for the Kubota business. (Holland Aff. (Docket Nos. 34-7. 34-8) Exs. 7, 8.) And two other existing Bobcat dealers offered to buy Bobcat of Duluth's Bobcat business. Tri-State Bobcat "offered in the 500 range" and Mahoney recalled that Bobcat of Grand Forks offered less than Tri-State. (Mahoney Dep. (Docket No. 34-3) at 139-40, 189.) Tri-State also made a verbal offer to buy the dual-brand dealership for $2.3 million and divest itself of the Kubota business within three years. (Id. at 132-33.) Bobcat withheld its consent for this proposal.

Bobcat of Duluth then filed this lawsuit, arguing that Bobcat imposed unreasonable conditions on the transfer of its dealer agreement, which allegedly reduced the potential purchase price from $2.3 million to $1,025,000. Counts I and II of the Complaint allege that Bobcat violated the Minnesota Heavy and Utility Equipment Manufacturers and Dealers Act ("MHUEMDA"), Minn. Stat. § 325E.0681, and the Minnesota Agricultural Equipment Dealers Act ("MAEDA"), Minn. Stat. § 325E.062. (Compl. (Docket No. 1) ¶¶ 48-73.) Count III contends that Bobcat breached the terms of its dealer agreement. (Id. ¶¶ 74-83.) Count IV seeks declaratory relief against Bobcat. (Id. ¶¶ 84-87.) Bobcat moves for summary judgment.

**DISCUSSION**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and inferences that "may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." Enter. Bank v. Magna Bank of Mo., 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

**A.     MHUEMDA and MAEDA**

Bobcat of Duluth contends that Bobcat violated the MHUEMDA and MAEDA by withholding its consent to let Bobcat of Duluth sell its dual-brand dealership to Quality Forklifts or Tri-State. (Compl. ¶¶ 55, 57, 68, 70.) The MHUEMDA and MAEDA provide, in relevant part, that no equipment manufacturer "may terminate, cancel, fail to renew, or substantially change the competitive circumstances of a dealership agreement without good cause." Minn. Stat. §§ 325E.062, subd. 1, 325E.0681, subd. 1.

Bobcat contends that these claims fail because Bobcat of Duluth continues to serve as a Bobcat dealer on the same terms of its dealer agreement, and Bobcat has not terminated, cancelled, failed to renew, or substantially changed the circumstances of the dealer agreement. See Midwest Great Dane Trailers, Inc. v. Great Dane Ltd. P'ship, 977

5

F. Supp. 1386, 1392 (D. Minn. 1997) (Alsop, J.) (stating that a claim exists under the

MHUEMDA "when a dealer alleges that a manufacturer has effectuated a 'substantial

change in competitive circumstances' without good cause").

Bobcat of Duluth argues that Bobcat's exclusivity policy, adopted in 2012,

constitutes a substantial change in the competitive circumstances of its dealer agreement.

To determine whether there has been a substantial change in the competitive

circumstances of a dealer agreement, the Court looks to "the prevailing conditions,

surroundings, or background of a dealership agreement." Id. (emphasis omitted).  A

substantial change in the competitive circumstances

> is a change that has a substantially adverse although not
> necessarily lethal effect on the dealership.  It is a change that
> is material to the continued existence of the dealership, one
> that significantly diminishes its viability, its ability to
> maintain a reasonable profit over the long term or to stay in
> business.

Astleford Equip. Co. v. Navistar Int'l Transp. Corp., 632 N.W.2d 182, 191 (Minn. 2001).

Here, Bobcat of Duluth argues that the 2012 exclusivity policy prevents it from selling

the business to buyers who would operate it as a dual-brand dealership.  But it fails to

identify how the exclusivity policy diminished its ability to maintain a reasonable profit

over the long term or its ability to stay in business.  See id.; see also Cunningham

Implement Co. v. Deere & Co., No. C7-95-1148, 1995 WL 697555, at *2 (Minn. Ct.

App. Nov. 28, 1995) (concluding that a manufacturer's decision to withhold consent to

transfer a dealer agreement did not substantially change the competitive circumstances

because the dealership's current business "remains at status quo").  Therefore, Bobcat has

not substantially changed the competitive circumstances of the dealer agreement.

Bobcat of Duluth next argues that the MHUEMDA and the MAEDA "expressly

prohibit a manufacturer from unreasonably withholding consent to a proposed transfer of

the dealer's dealership."  (Pl.'s Mem. in Supp. (Docket No. 32) at 26.)  This argument is

flawed because claiming that a manufacturer is unreasonably withholding consent to

transfer a dealership alone is not actionable under the MHUEMDA and the MAEDA.  As

discussed above, Bobcat of Duluth has failed to demonstrate a substantial change in the

competitive circumstances of a dealership agreement, a requirement under both statutes.

See Midwest Great Dane Trailers, 977 F. Supp. at 1392.  It is true that a manufacturer

"shall not withhold consent unreasonably" if a dealer has transferred an interest in a

dealership.    Minn. Stat. §§ 325E.062, subd. 1(1), 325E.0681, subd. 1(a).    But this

proscription relates to whether a manufacturer had good cause to terminate, cancel, fail to

renew, or substantially change a dealer agreement after a dealer transfers interest in a

dealership.  Because Bobcat did not substantially change the competitive circumstances

of the dealer agreement, this argument is without merit.

Even if withholding consent to transfer a dealership is actionable under the

MHUEMDA or the MAEDA, Bobcat claims that it had good cause to do so.  Good cause

is the "failure by [the] dealer to substantially comply with essential and reasonable

requirements imposed upon the dealer by the dealership agreement, if the requirements

are not different from those requirements imposed on other similarly situated dealers by

their terms."  See Minn. Stat. §§ 325E.062, subd. 1, 325E.0681, subd. 1.

Here, Bobcat of Duluth's dealer agreement prohibits assignment or transfer without Bobcat's prior written consent. (Ross Aff. Ex. 1 ¶ 16.) Notwithstanding the imposition of exclusivity, Bobcat attached a number of other requirements to its conditional approval of the transfer to Quality Forklift, including compliance with market share commitments stated in Quality Forklift's own business plan, a ban on selling competitive attachments with Bobcat equipment, and provisions addressing how to resolve a breach of these requirements. Bobcat of Duluth has not argued that these conditions, to which Quality Forklift would not agree, were unreasonable. On this basis alone, Bobcat's refusal to consent to the transfer would be for good cause. Consequently, the Court need not address the exclusivity requirements here because it would not affect the disposition of this matter.

Bobcat of Duluth has not established an actionable claim under the MHUEMDA or the MAEDA because Bobcat has not substantially changed the competitive circumstances of the dealer agreement, and Bobcat had good cause to withhold its consent. Counts 1 and 2 are dismissed.

**B.    Breach of Contract**

The Complaint alleges that Bobcat breached the dealer agreement and the implied covenant of good faith and fair dealing by unreasonably withholding its consent to the sale of Bobcat of Duluth's dual-brand dealership to either Quality Forklift or Tri-State Bobcat. (Compl. ¶¶ 77, 80-81.) "Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not 'unjustifiably hinder' the other party's performance of the contract." In re Hennepin Cty. 1986

8

Recycling Bond Litig., 540 N.W.2d 494, 502 (Minn. 1995).  The contract at issue here is

the dealer agreement.

Bobcat of Duluth argues that Bobcat's decision to withhold consent to sell the

dual-brand dealership violated the right-of-first-refusal provision in the dealer agreement.

(Pl.'s Opp'n Mem. (Docket No. 32) at 1.)  Bobcat argues that the right-of-first-refusal

provision was never triggered because Bobcat of Duluth did not secure a valid offer, and

regardless, the assignment provision enables Bobcat to withhold its consent to transfer or

assign any dealer agreement.

### 1.    Assignment Provision

Bobcat contends that the assignment provision gives it the unconditional right to

approve or deny any assignment of its dealer agreements.  This provision states that the

dealer agreement "may not be assigned or transferred by [Bobcat of Duluth] without the

prior written consent of BOBCAT."  (Ross Aff. Ex. 1 ¶ 16.)  Bobcat did not consent to

the assignment or transfer of the dealer agreement.  Bobcat of Duluth argues that right-of-

first-refusal provision controls, not the assignment provision, because it contains more

specific language regarding the sale of a dealership than the general language in the

assignment provision.

"Minnesota contract law instructs courts to make specific contract language

controlling over general language."  Jerry's Enters., Inc. v. U.S. Specialty Ins. Co., 845

F.3d 883, 890 (8th Cir. 2017) (citing Bank Midwest v. Lipetzky, 674 N.W.2d 176, 181

n.8 (Minn. 2004)).    But these provisions address different rights under the dealer

agreement, and thus the specific-over-general maxim is not applicable.

The assignment provision explicitly prohibits any assignment or transfer of the dealer agreement without Bobcat's prior written consent. The Eighth Circuit and the Minnesota Courts of Appeals have upheld similar provisions. In <u>Taylor Equipment, Inc. v. John Deere Co.</u>, the Eighth Circuit concluded that the manufacturer "has an absolute right to choose its equipment dealers" because a dealer agreement granted "an express, unrestricted right to disapprove a proposed assignment of [a dealership's] contract rights." 98 F.3d 1028, 1033 (8th Cir. 1996). In <u>Cunningham Implement</u>, a similar "non-assignment clause" gave the manufacturer "the right to approve or deny transfers of its dealerships." 1995 WL 697555, at *2 (concluding that withholding consent did not violate the MAEDA). The same type of provision exists here.

By contrast, the right-of-first-refusal provision gives Bobcat the right to buy a dealership first, if another prospective buyer has made an offer that the dealership is willing to accept. This provision contains no language regarding the assignment or transfer of the dealer agreement. Moreover, under Bobcat of Duluth's interpretation of these two provisions, Bobcat could block Bobcat of Duluth from transferring its dealer agreement to an undesirable prospective dealer only by purchasing its dealership first. This interpretation contradicts the assignment provision's express and absolute right that Bobcat may choose its dealers. The Court thus rejects Bobcat of Duluth's argument that these two provisions address the same rights and that the right-of-first-refusal provision controls because it contains more specific language.

10

Bobcat had the right to withhold its consent under the dealer agreement, and under these circumstances its decision to do so was neither a breach of the dealer agreement nor a breach of the implied covenant of good faith and fair dealing.

### 2.     Right-of-First-Refusal Provision

Bobcat maintains that the right-of-first-refusal provision was never triggered even if it is the controlling provision.  The right-of-first-refusal provision states:

> In the event that [Bobcat of Duluth] receives an offer to purchase its business . . . and [it] is willing to accept such offer, [Bobcat of Duluth] shall provide prompt written notice to BOBCAT . . . [who] shall have the right of first refusal to purchase the business . . . . If BOBCAT declines or fails to exercise [its right of first refusal] within such period, [Bobcat of Duluth] shall be free to conclude its sale to the third party at the same price and on such terms.

(Ross Aff. Ex. 1 ¶ 21.)  Bobcat maintains that Quality Forklift's LOI is not an offer.  An offer must be "clear, definite, and explicit, . . . leav[ing] nothing open for negotiation." Lefkowitz v. Great Minneapolis Surplus Store, Inc., 86 N.W.2d 689, 691 (Minn. 1957). Acceptance of an offer "will complete the contract."  Id.

Here, Quality Forklift's LOI lacked finality, explicitly permitted further negotiation, and clearly would not complete any contract if accepted.  The LOI states that it "does not constitute a purchase agreement, either express or implied, on behalf of Purchaser, does not impose any obligation on Purchaser to acquire any of the assets of Seller, and does not constitute a binding agreement."  (Gleekel Aff. (Docket No. 26) Ex. B at 1.)  Moreover, it states that Quality Forklift "will commence its formal due

diligence of Seller and Seller's business" and "shall thereafter proceed to in good faith negotiate, prepare and execute an initial draft of the definitive purchase agreement" if Quality Forklift is "satisfied with the status of its due diligence and desires to continue with the transaction." (Id.) Finally, the LOI provides that "neither Party has any legal obligation to complete the sale of Bobcat of Duluth, Inc.'s dealership." (Id. at 2.) The Court concludes that Quality Forklift's LOI was not an offer; rather, it is an agreement to act in good faith to develop an offer, and ultimately, a purchase agreement.

Bobcat of Duluth argues that this Court should construe "offer" as "merely '[t]he act or an instance of presenting something for acceptance,'" because the term is not defined in the dealer agreement and is therefore ambiguous. (Pl.'s Opp'n Mem. at 1 (alteration in original) (quoting Offer, Black's Law Dictionary (10th ed. 2014)).) But see Offer, Black's Law Dictionary (10th ed. 2014) (defining an "offer" as "a display of willingness to enter into a contract on specified terms, made in a way that would lead a reasonable person to understand that an acceptance, having been sought, will result in a binding contract.").

The Court "must give the contract language its plain and ordinary meaning." Current Tech. Concepts, Inc., v. Irie Enters., Inc., 530 N.W.2d 539, 543 (Minn. 1995). And "[i]f a contract is ambiguous, it must be construed against its drafter." Id. "A contract is ambiguous if its language is reasonably susceptible of more than one interpretation." Id. The term offer here is not ambiguous because it is reasonably susceptible to only one interpretation.

Even if Quality Forklift's LOI triggered the right-of-first-refusal provision, Bobcat of Duluth's interpretation of the provision would have required Bobcat to purchase the entire dealership—both the Bobcat and Kubota businesses.  This interpretation would lead to an absurd result, because it would require Bobcat to purchase Bobcat of Duluth's Kubota product lines.  See RAM Mut. Ins. Co. v. Meyer, 768 N.W.2d 399, 406 (Minn. 2009) (stating that Minnesota courts should "constru[e] contracts in a manner that avoids absurd and unjust results").

In sum, Bobcat did not breach the dealer agreement or the implied covenant of good faith and fair dealing as a matter of law, because the dealer agreement provided Bobcat with the absolute right to select its dealers, and Count 3 is dismissed.

## C.    Declaratory Judgment

The Complaint seeks a declaratory judgment, directing Bobcat to consent to Bobcat of Duluth's sale of the entire dealership to one purchaser.  (Compl. ¶¶ 84-87.) Because the Court concludes that Bobcat's decision to withhold consent is lawful, Count 4 is dismissed.  See Scanlon v. Nw. Mortg., Inc., No. 11-CV-3128, 2012 WL 2885131, at *7 (D. Minn. July 13, 2012) (Davis, C.J.) (dismissing a claim for declaratory relief because the plaintiffs' substantive claims were without merit).

**CONCLUSION**

Bobcat of Duluth has not established an actionable claim under the MHUEMDA or the MAEDA, and as a matter of law, Bobcat did not breach the dealer agreement or the implied covenant of good faith and fair dealing. Accordingly, **IT IS HEREBY ORDERED that** Bobcat's Motion for Summary Judgment (Docket No. 21) is **GRANTED**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: <u>January 25, 2018</u>

*s/ Paul A. Magnuson*

Paul A. Magnuson
United States District Court Judge
